**Damon Jerome RICHARDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 901–92

Court of Criminal Appeals of Texas, En Banc.

Oct. 27, 1993.

Rehearing Denied Dec. 8, 1993.

**2.** TEX REV.CIV.STAT ANN. art. 6701d § 36(c) (Vernon 1977).

**3.** Id.

Richard L. Wardroup, Lubbock, for appellant.

Travis S. Ware, Dist. Atty. and Michael West, Asst. Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

*OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

CLINTON, Judge.

◼ Appellant was convicted of the offense of engaging in organized criminal activity in violation of V.T.C.A. Penal Code, § 71.-02, and the jury assessed punishment at life confinement in the penitentiary and a $10,000 fine. On appeal he contended, *inter alia*, that the trial court erred in overruling his motion to suppress evidence obtained by use of a pen register because the use of the pen register was a search in contemplation of Article I, § 9 of the Texas Constitution; therefore, Article 18.21 V.A.C.C.P. is unconstitutional insofar as it authorizes a search without requiring a showing of probable cause.[1] The Amarillo Court of Appeals affirmed, holding that Article 18.21, supra, is not unconstitutional for failing to require probable cause because the use of a pen register is not a search under the Texas Constitution. *Richardson v. State*, 821 S.W.2d 304 (Tex.App.—Amarillo 1991).

We have seen this cause before. *Richardson v. State*, 824 S.W.2d 585 (Tex.Cr.App. 1992). Because the court of appeals relied on cases from this Court which held that Article I, § 9 was not more restrictive than the Fourth Amendment to the United States Constitution, we vacated the judgment of the court of appeals and remanded the case for reconsideration in light of our opinion in *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr. App.1991) (When analyzing and interpreting Article I, § 9, Texas courts will not be bound

---

1. Article 18.21, supra, authorizes Texas law enforcement's use of pen registers as a means of electronic surveillance. A pen register is a mechanical or electronic device that attaches to a telephone line and is capable of recording outgoing numbers dialed from that line but is not capable of recording the origin of an incoming communication to that line or the content of a communication carried between that line and another line. Article 18.21, § 1(2).

Although Article 18.21 does establish a number of prerequisites to the issuance of a court order authorizing the use of a pen register, the statute does not require an applicant show probable cause. The statute merely requires that the application state the installation and utilization of the pen register will be material to the investigation of a criminal offense. Article 18.21, § 2(b).

(Article 18.21 was extensively amended in 1989. See Acts 1989, 71st Leg., Ch. 958, § 1, p. 4026, eff. Sept. 1, 1989. Because the pen registers at issue in this cause were obtained in early 1988, we cite the provisions of the statute as they appeared prior to the 1989 amendment. In any event, even after the 1989 amendment, Article 18.21 does not require probable cause as a predicate to obtaining a court ordered pen register.)

by Supreme Court decisions addressing the comparable Fourth Amendment issue). On remand, the court of appeals reaffirmed its original holding. *Richardson v. State*, 831 S.W.2d 78 (Tex.App.—Amarillo 1992). We granted appellant's second petition for discretionary review to determine the novel question of whether the installation and use of a pen register by law enforcement personnel requires probable cause under the Texas Constitution. Tex.R.App.Pro., Rule 200(c)(2).

## I.

### Facts

In March of 1988, officers of the Texas Department of Public Safety were involved in an extensive investigation of a suspected drug ring operating in Lubbock County. The investigation centered around appellant, who was in the Lubbock County Jail awaiting trial for capital murder, and several other individuals residing at the Seven Acres Lodge, a motel in Lubbock. Despite appellant's incarceration, officers believed that he was controlling a cocaine and crack distribution organization using the telephones located in the county jail, by placing calls to a private telephone located at the Seven Acres Lodge. Due to the difficulty in investigating this case through customary investigative techniques, the officers sought court orders authorizing electronic surveillance to assist in their identification of co-conspirators and the modus operandi of the alleged trafficking organization.

On March 30, 1988, in accordance with the provisions of Article 18.21, supra, the officers applied for and received a court order authorizing the installation of a pen register to catalogue the telephone numbers dialed from (806) 744–4729, a telephone at the Seven Acres Lodge. The officers then combined this information with other information outlined in a fifty-six page affidavit signed by Officer J.A. Randall, and on April 13, 1988, applied for and received a court order authorizing the wiretapping and recording of communications on the same telephone line. See Article 18.20, V.A.C.C.P. The wiretap intercepted numerous incriminating telephone conversations involving appellant and other targeted suspects. Based largely on these conversations, the officers executed several search warrants which uncovered evidence relating to the drug trafficking organization. This evidence and the taped conversations were presented to the jury which ultimately convicted appellant.

Prior to trial on the merits, appellant filed several motions seeking to suppress all "fruits" derived from the pen registers. In a single motion, appellant sought to suppress any evidence obtained through registers installed on the telephones on numbers (806) 741–1271, (806) 741–1272 and (806) 744–4729 or any other telephone number in connection with the present investigation. Despite the breadth of appellant's motion, testimony at the pretrial hearing revealed that there were only two court orders issued in this case authorizing pen registers. The first pen register was ordered on March 30, 1988, and was installed to record the telephone numbers dialed from (806) 744–4729, a private telephone at the Seven Acres Lodge. The second pen register was ordered on April 14, 1988, and was installed to record the telephone numbers dialed from (806) 741–1272, a limited use telephone in the Lubbock County Jail. In both instances, the installation of the register was authorized by court order pursuant to Article 18.21, supra.

Appellant argued that the government's use of a pen register is a search under Article I, § 9 of the Texas Constitution:

> "yet the provisions of 18.21 allow such installations without the showing of probable cause that criminal activity is, has been or is about to be engaged in and that said telephone is, has been, or is expected to be utilized in the course of conduct of such criminal activity."

Thus, appellant argued that Article 18.21 is unconstitutional and that the court orders issued in the instant case, which failed to set forth probable cause, were illegal and ineffectual, and all fruits of the execution of these

orders should be suppressed. The trial court summarily denied appellant's motion without comment.[2]

### Court of Appeals' Opinion

▇ The court of appeals disposed of appellant's contentions on appeal on the basis of a broad holding that the use of a pen register is never a search within the purview of Article I, § 9. Whether the government's activity was a search depends upon whether at the time the activity occurred appellant had a reasonable expectation of privacy. *Richardson*, at 80. The court of appeals observed:

"[w]hen making a telephone call, a person conveys the information as to the number called to the telephone company. Thus, as contrasted to the content of the telephone conversation which, of course, is not revealed in the usual course of business, a caller has no reasonable expectation of privacy as to the number called. The information as to the number called is not information which is concealed ... but is, rather, information which has been disclosed."

*Id.* Because an individual does not have a reasonable expectation of privacy in the numbers which are disclosed to the telephone company, the court of appeals reasoned, the government's use of a pen register to catalogue those numbers is not a search under Article I, § 9. Thus, Article 18.21 is not unconstitutional for failing to require probable cause for the use and installation of a pen register.

The court of appeals did note that several other state courts have held their state constitutions do provide a person with a reasonable expectation of privacy in the telephone numbers dialed on the telephone. *State v. Gunwall*, 106 Wash.2d 54, 720 P.2d 808 (1986); *People v. Sporleder*, 666 P.2d 135 (Colo.1983); *State v. Hunt*, 91 N.J. 338, 450 A.2d 952 (1982). However, the court of appeals believed these courts placed undue emphasis on the facts that a telephone is a necessity of modern life and an individual has no choice but to divulge the number dialed to the telephone company. Instead, the court of appeals analogized the disclosure of the telephone number to an individual who "must travel in a manner that is open to public

2. In his petition, appellant asserts the pen register on the telephone at the Seven Acres Lodge "captured records pertaining to petitioner's collect phone calls" from the county jail. We are not certain that is an accurate characterization. Our understanding is that by definition a pen register is not capable of recording the origin of an incoming call. See Article 18.21 § 1(2), supra, and n. 1, *ante*. If appellant's assertion is correct, the pen register would in effect have recorded the origin of an incoming call. But the record does not reveal that an incoming collect call will show up on a pen register.

A close reading of Officer Randall's affidavit in support of the application for the wiretap reveals the precise sources of his information. The affidavit shows the investigation concerning the telephone located at the Seven Acres Lodge involved not only the pen register ordered on March 30, 1988, but also a subpoena issued on March 4, 1988, for the telephone toll records for that particular telephone. Randall's affidavit states that it was his examination of the toll records that revealed the numerous collect calls from the telephone located at the Lubbock County Jail. It thus appears that the only information gathered from the pen register on the telephone at the Seven Acres Lodge which was subsequently included in the application for the wiretap was the

fact that between March 31, 1988, and April 4, 1988, there were in excess of 1,300 telephone calls placed from that telephone. Randall stated such a large number of calls is consistent with drug trafficking.

It is true that from Randall's affidavit it appears that the pen register installed on the telephone at the Seven Acres Lodge was not the only pen register involved in this case. The officers also requested and received a court order authorizing the installation of a pen register to catalogue telephone numbers dialed from the limited use telephone located in the Lubbock County Jail. But while this pen register would no doubt have recorded all outgoing numbers dialed from that telephone, it was not activated until April 14, 1988, in conjunction with the wiretap, and could not have provided any information used to establish probable cause for the issuance of the wiretap.

Nevertheless, both appellant and the State appear to have accepted the premise that somehow the pen register at the Seven Acres Lodge recorded appellant's collect phone calls, and that this information in turn contributed to the obtaining of the warrant authorizing the wiretap. It is in this posture that the petition for discretionary review was presented and in this posture that it was granted.

view" in order to get to work or an individual who actually works in public view such as the cashier at a grocery store. *Richardson,* at 80. The court of appeals opined that the necessity of exposing oneself to public view in these situations dispels any reasonable expectation of privacy; therefore, so should the necessity of exposing the numbers dialed on a telephone.

The court of appeals also rejected the argument that a reasonable privacy interest exists because the caller's disclosure of the telephone numbers was for the limited business purpose of providing telephone communication services and was not for release to the general public. The court of appeals was persuaded that such logic would result in "a drug dealer who solicits sales on a street corner" having "a reasonable expectation of privacy because his solicitation has been made for a limited business purpose." *Id.,* at 80–81. In our estimation the court of appeals has taken too narrow a view of the privacy interest under Article I, § 9.

## II.

### Reasonable Expectation of Privacy

█ Article I, § 9 of the Constitution of the State of Texas provides:

"The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

The Fourth Amendment to the United States Constitution acknowledges the inviolability of the "right" of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. If anything, Article I, § 9 recognizes that same basic protection, but in terms more imperative. We have observed that the two provi-

sions are "in all material aspects, the same." *Eisenhauer v. State,* 754 S.W.2d 159, at 162 (Tex.Cr.App.1988). But in *Heitman v. State,* supra, we disavowed any notion that because the two provisions are "the same," this Court is obliged to interpret their protections co-extensively. Even if the language of Article I, § 9 were identical with that of the Fourth Amendment, we must construe that language according to our own lights.[3] *Id.; Brown v. State,* 657 S.W.2d 797 (Tex.Cr.App.1983) (Clinton, J., concurring); *Eisenhauer v. State,* supra (Clinton, J., dissenting); *Osban v. State,* 726 S.W.2d 107 (Tex.Cr.App.1986) (Miller, J., dissenting). We do not hesitate, however, to examine Fourth Amendment analogues, or the construction other states have given their own constitutional provisions regarding search and seizure, for guidance. *Heitman,* supra, at 690, n. 22.

As with the Fourth Amendment, the purpose of Article I, § 9 is to safeguard an individual's legitimate expectation of privacy from unreasonable governmental intrusions. *Green v. State,* 566 S.W.2d 578 (Tex.Cr.App. 1978). "Thus, the Fourth Amendment and Article I, § 9, protect people not places." *Id.,* at 582. Under the Fourth Amendment, the substantive question of what is a search was effectively merged with what had been a procedural question of "standing" to challenge such a search. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). It is now a matter, not only of whether the government has breached some "reasonable," "justifiable," or "legitimate expectation of privacy" which existed in a particular place, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), but also of who reasonably, justifiably or legitimately harbored that expectation. *Chapa v. State,* 729 S.W.2d 723 (Tex.Cr.App.1987). "The litmus for determining the existence of a legitimate expectation of privacy as to a particular accused is twofold: first, did he exhibit by his conduct 'an actual (subjective) expectation of privacy[;]' and second, if he did, was that subjective expectation, 'one that society is

---

**3.** Indeed, we used this prerogative, in *Welchek v. State,* 93 Tex.Cr.R. 271, 247 S.W. 524 (1923), to hold that, unlike the Fourth Amendment, Article I, § 9 embodies no exclusionary rule.

prepared to recognize as "reasonable" ' " *Id.,* at 727. Ultimately, in the context of both the Fourth Amendment and Article I, § 9, whether the government's installation and use of a pen register constitutes a search necessarily depends upon whether appellant has a "legitimate expectation of privacy" in the numbers he dialed on the telephone. In other words, in determining the legitimacy of appellant's expectation of privacy, the appropriate inquiry is whether appellant expected that the numbers he dialed on the telephone would be free from governmental intrusion, and, if he did, is this expectation one that society is prepared to recognize as reasonable.

### The Fourth Amendment Analogue

For purposes of the Fourth Amendment, a 5–3 majority of the Supreme Court has held that the installation and use of a pen register is not a search. This is so, the Court observed, because an individual "in all probability" entertains no actual expectation of privacy in the phone numbers he dials, and, even if he did, such an expectation is not "legitimate." *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). The majority reasoned that telephone users "typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes." *Id.,* U.S. at 743, S.Ct. at 2581, L.Ed.2d at 228. Telephone users, therefore, cannot have an actual expectation that the numbers they dial will remain private.

The *Smith* majority further reasoned that even if an individual did have an actual expectation that the numbers he dials would remain secret, such an expectation is not one that society would recognize as reasonable. To the majority, the disclosure of the telephone numbers was similar to other cases in which the Court held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties. In particular, the Court noted *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), which held that the government could access a bank depositor's financial records, including the depositor's monthly statement, checks and deposit slips, without probable cause. The *Miller* Court noted "that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Miller,* at 443, 48 L.Ed.2d 71, 96 S.Ct. 1619. Thus, the bank depositor who has voluntarily disclosed certain financial information to the bank and, necessarily, its employees, takes the risk that the information will be conveyed by the bank or its employees to the government. Having assumed this risk, the bank depositor has no legitimate expectation of privacy.

Similarly, the caller who has voluntarily disclosed the telephone number to the telephone company has assumed the risk that the telephone company would reveal these numbers to the police. For this reason the telephone caller has no legitimate expectation of privacy in the telephone numbers dialed. The installation and use of a pen register to record these numbers is therefore not a search under the Fourth Amendment, and no warrant is required.

### Critical Response to Smith

The Supreme Court's holding in *Smith* has not gone without criticism. Quite the contrary, a number of legal commentators have rejected the Court's holding as making "a mockery of the Fourth Amendment." 1 W. LaFave, Search And Seizure: A Treatise on the Fourth Amendment § 2.7(b), at 507 (2d ed. 1987).

"Under *Smith,* the police may without any cause whatsoever and for whatever purpose they choose uncover private relationships with impunity merely because the telephone company might under *some* circumstances for *certain limited purposes*

make a record of such relationships for the company's *own* use. Indeed, it is enough for the majority in *Smith* that the telephone company has the capacity to make a record of such relationships, even though the company has the good sense not to offend its subscribers by making or keeping those records for no reason."

*Id.,* at 507. LaFave agreed with Justice Marshall's dissent that the mere fact that a telephone user may know the telephone company can monitor his calls for internal reasons does not necessarily mean that he expects "this information to be made available to the public in general or the government in particular." *Smith,* 442 U.S. at 749, 99 S.Ct. at 2585. LaFave went on at length to say:

"It was clear even before Katz that the protections of the Fourth Amendment extend to certain matters which are not absolutely, 100% private. Thus, even though a tenant may not have absolute privacy in his home because the landlord may enter 'to view waste,' the Supreme Court did not hesitate to hold that the residence is protected by the Fourth Amendment from police intrusion even with the landlord's permission. [Footnote citing *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).] Similarly a person who rents a hotel room cannot be said to have absolute privacy in that room, for 'he gives "implied or express permission" to "such persons as maids, janitors or repairmen" to enter his room "in the performance of their duties," ' but this certainly does not mean that a hotel room is not protected by the Fourth Amendment against unreasonable police entry. [Footnote citing *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).] Katz did not overrule those decisions, but rather extended them to situations in which no physical trespass is necessary for the police to obtain that which an individual sought to preserve as private. This being so, it makes no sense to say that the telephone subscriber (any more than the tenant or the hotel occupant) is fair game for unrestrained police scrutiny merely because he has surrendered some degree of his privacy for a limited purpose to those with whom he is doing business. As Professor Amsterdam put it '[t]he fact that our ordinary social intercourse, uncontrolled by government, imposes certain risks upon us hardly means that government is constitutionally unconstrained in adding to those risks.' [Footnote citing Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 406 (1974).]"

Lafave, at 508.

Another noted commentator in the area of electronic surveillance agrees with Lafave that the majority in *Smith* "failed to appreciate, or to adequately discuss, several considerations." C. Fishman, Wiretapping and Eavesdropping § 28.1(2), at 251–252 (Supp. 1992). Recognizing that ordinarily telephone companies do not make records of local numbers dialed from a telephone, Fishman believes it "strains logic" to hold that an individual should expect and assume the risk that such a record would be made at the request of the police. *Id.,* at 252. Additionally, it "is inappropriate to speak of a telephone user assuming the risk of pen register surveillance, since the user has no practical alternative but to forego the use of the telephone altogether. Further, unrestricted use of pen registers by the police would have a substantial and deleterious effect on privacy" since the disclosure of an individual's personal contacts reveals an enormous amount of information about that individual. *Id.*

In addition to the commentators, numerous state courts have criticized the Supreme Court's holding in *Smith.* At least seven States have rejected the reasoning of *Smith,* holding that their state constitutions provide an individual with a protected privacy interest in the telephone numbers dialed from a telephone. *State v. Hunt,* supra (New Jersey Constitution gives a telephone subscriber a constitutionally protected privacy interest in the telephone company's home toll billing records for the subscriber's telephone); *People v. Blair,* 25 Cal.3d 640, 159 Cal.Rptr. 818,

at 826, 602 P.2d 738, at 746 (1979) ("a hotel guest may reasonably expect that the calls he makes from his room are recorded by the hotel for billing purposes only, and will not be disclosed to others without legal process"); *Commonwealth v. Beauford,* 327 Pa.Super. 253, 475 A.2d 783, at 791 (1984) ("an individual's expectation of privacy in telephone numbers he calls is reasonable, legitimate, and is protected by the State Constitution against government surveillance and intrusion without probable cause"); *People v. Sporleder,* supra (under the Colorado Constitution a telephone subscriber has a legitimate expectation of privacy that telephone numbers dialed on a home telephone will remain private and that in the absence of exigent circumstances law enforcement officers must have a search warrant supported by probable cause prior to the installation of a pen register); *State v. Gunwall,* supra, at 813 ("The privacy interests of citizens which are protected by article 1, section 7 of the Washington State Constitution prevent the defendant's long distance telephone records from being obtained from the phone company, or any pen register from being installed on her telephone connections, without a search warrant"); *State v. Thompson,* 114 Idaho 746, 760 P.2d 1162 (1988) (Installation of a pen register on defendant's telephone line was a search under the State Constitution); *Rothman v. State,* 70 Haw. 546, 779 P.2d 1, at 7 (1989) ("persons having private telephone lines have a reasonable expectation of privacy with respect to the communication of the numbers they call, and the numbers of incoming calls, and the seizure of those numbers by the government, without a warrant, would violate such persons' right to privacy"). All but one of these cases involve construction of a state constitutional provision that is substantially similar to our Article I, § 9.[4]

Underlying these criticisms is an idea expressed very eloquently in *Beauford,* supra:

"[t]he fact that the telephone company and its employees in the course of providing telephone service collect information on the numbers dialed from a particular phone does not alter one whit the ordinary expectation that the prying eyes of the government or anyone else will be kept in the dark absent legal process. Indeed, an expectation to the contrary—that information provided to the telephone company for a limited record-keeping purpose automatically becomes available to the police for criminal investigative purposes—should have no foundation in a free society."

*Id.,* 327 Pa.Super. 253, 475 A.2d at 789–790. We agree. The mere fact that a telephone caller has disclosed the number called to the telephone company for the limited purpose of obtaining the services does not invariably lead to the conclusion that the caller has relinquished his expectation of privacy such that the telephone company is free to turn the information over to anyone, especially the police, absent legal process.[5]

### III.

Both the Supreme Court in *Smith* and the court of appeals in this cause operate

4. The constitution of the state of Washington contains a provision specifically insulating governmental intrusion upon a person's "private affairs." *Gunwall,* supra, at 814. Hawaii's constitution contains specific privacy clauses in addition to a provision substantially similar to Article I, § 9. *Rothman,* supra at 5.

5. In support of its conclusion that the use of a pen register is not a search under the Texas Constitution, the court of appeals cited a number of "well-reasoned" cases from other states "which have applied the same reasoning and arrived at the same result." See *In re Order for Indiana Bell Tel., Etc.,* 274 Ind. 131, 409 N.E.2d 1089 (1980); *State v. Fredette,* 411 A.2d 65 (Sup. Ct..Me.1979); *People v. Guerra,* 65 N.Y.S.2d 60, 489 N.Y.S.2d 718, 478 N.E.2d 1319 (1985); *State v. Valenzuela,* 130 N.H. 175, 536 A.2d 1252 (1987); *Yarbrough v. State,* 473 So.2d 766 (Fla. Add.Dist.1985); *State ex rel Ohio Bell Tel. Co. v. Williams,* 63 Ohio St.2d 51, 407 N.E.2d 2 (1980); *Smith v. State,* 283 Md. 156, 389 A.2d 858 (1978), aff'd 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

Only three of the cases cited by the court of appeals arguably concern expectations of privacy in telephone numbers dialed on a telephone under state constitutional provisions similar to Article I, § 9. *Guerra,* supra, held Article I, § 12 of the New York State Constitution does not give an individual a legitimate expectation of privacy in records maintained by the telephone company. Similarly, *Valenzuela,* supra, concluded the use of a pen register was not a search within the meaning of the state constitutional prohibition against unreasonable search and seizure. Final-

under what we regard as an erroneous belief that any voluntary disclosure of information will destroy a reasonable expectation of privacy of that information. The Supreme Court reasoned that by disclosing information to a third party, an individual "assumes the risk" of further disclosure by that third party to the government. 442 U.S. at 744, 99 S.Ct. at 2582, 61 L.Ed.2d at 229. Having assumed that risk, the individual cannot reasonably expect the information to remain private. With all due respect, we believe this analysis begs the question.[6]

Certainly it is true that a general or indiscriminate disclosure of what otherwise may seem private information by its very nature evinces the lack even of a subjective expectation of privacy. Thus, the drug vendor of the court of appeals' hypothetical, hawking his wares on the street, does not even demonstrate a subjective belief that his activities will remain private. Even if he did, the open nature of the disclosure obviates any possibility that the public would share his belief, and thus he cannot claim an objectively reasonable expectation of privacy. We agree with the court of appeals that it makes no difference that he claims the disclosure serves a business (albeit an illicit business) purpose.

■ But whether an individual "assumes the risk" that a more limited disclosure will open the door to public disclosure depends, we think, upon the reasonableness of his subjective belief (if any) that the disclosure will in fact go no further. A selective disclosure may evidence a subjective expectation of privacy; the circumstances in which information is related to a third party may show a unilateral or even a mutual understanding that the information will remain confidential. This is not an understanding that society is invariably willing to recognize as legitimate, however, for society may have no particular stake in the matter. See *Smith v. Maryland,* U.S. at 743–44, S.Ct. at 2582, L.Ed.2d at 229. Thus, a subjective expectation of privacy despite a limited disclosure is not always a "reasonable" one.

■ There are some subjective expectations of privacy, however, that society does sanction as legitimate in spite of limited, confidential disclosure. We would not want to say, for example, that society does not recognize the confidentiality of information imparted to a physician behind the closed doors of an examination room. That certain facts may be revealed in the necessarily candid process of diagnosis and treatment does not mean we no longer have a collective interest in insulating them from public scrutiny. On the contrary, society accepts—indeed, positively insists—that such information, although of necessity partly exposed, should nevertheless retain its essentially private character. Cf. *State v. Comeaux,* 818 S.W.2d 46, at 52–53 (Tex.Cr.App.1991) (Plurality opinion) (defendant had reasonable expectation that blood sample given to physician at hospital after accident would not "be submitted to the State, or to any other person or entity, for a purpose other than that

---

ly, in *Yarbrough,* supra, the court held that Article I, § 12 of the Florida State Constitution provides no legitimate expectation of privacy, which society would recognize as reasonable with regard to numbers dialed into a commercial telephone system. These cases essentially accept *Smith* and its Fourth Amendment analysis as irrefutable gospel.

Of the remaining cases, *In re Order for Indiana Bell, Williams,* and *Smith,* all supra, involve the Fourth Amendment rather than independent state constitutional provisions, and *Fredette* concerns bank records as opposed to telephone records.

6. That a pen register is necessary in the first place suggests that the telephone company does not record outgoing local numbers, not separate-

ly billable, in the ordinary course of business. Because the process is automated, there is no human agency involved in placing local calls. It is true that when a customer makes a local call he "voluntarily convey[s] numerical information to the telephone company and 'expose[s]' that information to its equipment in the ordinary course of business." *Smith,* 442 U.S. at 744, 99 S.Ct. at 2582, 61 L.Ed.2d at 229. But such a fleeting, unrecorded exposure to the telephone company's switching equipment hardly seems to count as a disclosure. Even if it is a limited disclosure, we conclude it is not sufficient to rob the customer of an objectively reasonable expectation of privacy, notwithstanding the Supreme Court's conclusion to the contrary in *Smith.* See text, *post.*

for which it was given.").[7]  In view of this societal imperative, it is hardly fair to reason that the patient "assumed the risk" of public disclosure because of the forthrightness with which he spoke to his doctor.

Although the argument is not quite as compelling, we believe it would be likewise unfair to hold that the customer "assumes the risk" of public disclosure of a number he dials on the telephone.  Other than for billing purposes, the telephone company itself has no interest in memorializing that information.  Moreover, the telephone company is fiercely protective of what it considers the privacy interest of its customers even in the information it does record in the ordinary course of business—as any private citizen will discover if he attempts to obtain the telephone bill of another customer without that other's express permission.[8]  See *People v. Sporleder*, supra, at 141.  It goes without saying that telecommunications are pervasive in our society.  The telephone company's vigilance in protecting from public disclosure the uses to which its customers put their telephones reflects a value that is equally pervasive.  As

with information imparted to a doctor, we share a common understanding that the numbers we call remain our own affair, and will go no further.  Thus, society recognizes as objectively reasonable the expectation of the telephone customer that the numbers he dials as a necessary incident of his use of the telephone will not be published to the rest of the world.  Cf. *Ex parte Gould*, 60 Tex.Cr.R. 442, at 450, 132 S.W. 364, at 368 (1910) (telegraph communications are protected by Article I, § 9, as least to the extent that a subpoena must show with particularity, "describing ... as near as may be," the messages sought to be discovered, the Court observing: "To a certain extent the telegraph company is but the trustee of the sender of the message.  It has by reason thereof in its possession important and valuable communications which should not be subject to exposure to the prying curiosity of idle gossips, or the malice of malignant mischief makers.").

■ It follows that the use of a pen register may well constitute a "search" under Article I, § 9 of the Texas Constitution.[9]

---

**7.** It is true that we have no physician-patient privilege in criminal cases.  Tex.R.Cr.Evid., Rules 509 & 1101(b).  See *Comeaux*, supra, at 54, n. 1 (Campbell, J., concurring).  Nevertheless, it appears physicians still have a duty of confidentiality, enforced, subject to certain enumerated exceptions, by statute.  V.A.T.C.S., art. 4495b, § 5.08 (Supp.1993).  See Goode, Wellborn & Sharlot, Texas Practice: Texas Rules of Evidence: Civil and Criminal § 509.1, at 299–300, n. 6 (1988), and at 81, n. 6 (Supp.1992).  That a doctor may eventually be called to testify or his medical records admitted in a criminal proceeding does not otherwise liberate him to disclose confidential information.  Even if doctor confidentiality is not enforced by law, medical ethics demand it.  *Goode, Wellborn & Sharlot*, supra, at 301, n. 15.  And in any event, it is doubtful the tattling physician would retain his clientele for long!

**8.** On page 37 of the prefatory pages of the 1992–1993 Greater Austin Telephone Directory printed by Southwestern Bell we find the heading, "Your Rights As a Customer."  Under the subheading, "Telecommunications Privacy," we find the following assurance: "We fully safeguard every individual's right to privacy as an essential aspect of our service.  We carefully strive to protect communications services from unlawful wiretapping or other illegal interception.  Customer ser-

vice records, credit information and related confidential personal account information are fully protected."

**9.** Judge Campbell argues in dissent that under the peculiar circumstances of this case appellant had no subjective expectation of privacy, nor an objectively reasonable one.  The court of appeals did not address this narrower question, however, preferring to decide the cause on the basis of a broader holding that use of a pen register will not under *any* circumstances constitute a "search" for purposes of Article I, § 9.  Indeed, we have already remanded this cause once for the court of appeals to reconsider this broader question from the perspective of our opinion in *Heitman*.  It would be anomalous, and somewhat ironic in view of our earlier remand, to dispose of this cause now on the narrower question the court of appeals has never addressed.  Cf. *Wilson v. State*, 772 S.W.2d 118, at 120, n. 3 (Tex.Cr.App.1989) (in appellant's petition for discretionary review, State must file cross-petition for this Court to review alternative basis for decision raised but not addressed in court of appeals); *Keith v. State*, 782 S.W.2d 861, at 863–64, n. 4 (Tex.Cr.App.1989) (same); *Haughton v. State*, 805 S.W.2d 405, at 407, n. 1 (Tex.Cr.App. 1990) (same).  This is not to say the court of appeals may not address this narrower question on the second remand.  See n. 10, *post*.  We

The question remaining is whether such a search would be "unreasonable" in the absence of probable cause. If so, then to the extent it authorizes a court ordered pen register without a showing of probable cause, Article 18.21, supra, violates Article I, § 9. Because the court of appeals did not decide the question of reasonableness, *inter alia,* we remand the cause for further disposition.[10]

The judgment of the court of appeals is vacated and the cause is remanded to that court for further proceedings not inconsistent with this opinion.

MILLER, J., joins with note:

While it is true that the State raised expectation of privacy *under the facts of this case* in the court of appeals, *they* believed the threshold question to answer was whether a search occurs generally in a pen register case. To say at this date that the threshold question is expectation of privacy *under the facts of this case* is a needless slap in the face to the court of appeals.

This Court's function is to answer the questions presented in grounds for review contained in granted petitions for discretionary review. The issue of expectation of privacy *under the facts of this case* is not contained in this case's ground for review either top, side, or bottom. However, it now can be addressed and answered by the court of appeals, as I presume it would have been had they answered differently the threshold questions of general expectation of privacy in the dialing of telephone numbers and whether there was even a search in this case.

WHITE, J., dissents.

CAMPBELL, Judge, dissenting.

The majority perceives the question presented to be the abstract one of whether the State's use of a pen register *may* constitute a "search" under Article I, § 9, of the Texas Constitution. Clearly, however, that is not the question presented. The true question presented is whether appellant has shown that he, as a pretrial detainee in a county jail, had a reasonable expectation of privacy in the telephone numbers he dialed on the jail telephone.[1] If he had a reasonable expectation of privacy in those telephone numbers, then the State's use of a pen register to acquire the numbers was a constitutionally cognizable "search."[2] Because I conclude that appellant has not shown that he had a

---

hold only that the court of appeals erred to dispose of appellant's many points of error on appeal on the basis of a broad holding that the use of a pen register never, under any circumstances, constitutes a "search" under Article I, § 9.

10. The court of appeals disposed summarily of "several points of error predicated in whole or in part upon the proposition that the use of a pen register is a 'search' within the purview of Art. I, § 9[,]" by holding categorically that use of a pen register is never, under any circumstances, a search. *Richardson* supra, 831 S.W.2d at 79 & 81. Should it hold on remand that the use of a pen register was indeed a "search" under the peculiar facts of *this* case, see n. 9, *ante,* and that the such search was "unreasonable" absent probable cause, then, to the extent, if any, that the pen register placed on the telephone at the Seven Acres Lodge ((806) 744–4729) proved that appellant made collect calls to that number, but see n. 2, *ante,* that information was illegally obtained. See points of error four and five, *Richardson v. State,* 821 S.W.2d at 306–307. To the extent the pen register recorded only local calls placed from the telephone at the Seven Acres Lodge, however, the question yet remains

whether appellant has standing to complain. Whether and, if so, to what extent the wire intercept, and various items of evidence obtained as a result of the wire intercept, were the illegal products of that pen register are also questions to be reconsidered by the court of appeals in light of our holding today. See points of error six, seven, eight, nine, ten, eleven, and sixteen, *id.,* at 307–308. Finally, whether error, if any, was harmless beyond a reasonable doubt under Tex. R.App.Proc., Rule 81(b)(2), is a question for the court of appeals to decide in the first instance.

1. In both its brief to the court of appeals and its brief to this Court, the State has argued that appellant, because he was a pretrial detainee using a jail telephone, had no reasonable expectation of privacy in the numbers he dialed on that telephone.

2. The court of appeals held that no citizen can ever have an objectively reasonable expectation of privacy in the numbers he dials on any telephone. *Richardson v. State,* 831 S.W.2d 78 (Tex. App.—Amarillo 1992). I need not opine today whether the court of appeals' broad holding was correct; rather, I conclude only that appellant, *as a pretrial detainee,* had no objectively reason-

reasonable expectation of privacy in the telephone numbers, I dissent from the majority's abstract holding that the State's acquisition of those numbers *"may well constitute* a 'search' under Article I, § 9, of the Texas Constitution." (Emphasis added.)[3]

Around September 15, 1987, appellant was arrested for capital murder and detained in the Lubbock County Jail to await trial. Sometime between September 15, 1987, and March 30, 1988, state law enforcement authorities learned from informants that appellant was using a telephone at the Lubbock County Jail to continue his control of an illicit drug operation at the Seven Acres Lodge in Lubbock. The authorities also received information that two of appellant's fellow inmates made calls to the Lodge at his request and relayed information to and from him regarding the drug operation.

On March 30, 1988, the authorities, acting pursuant to Article 18.21, § 2, of the Texas Code of Criminal Procedure, obtained a court order authorizing the installation of a pen register on the Lodge telephone. Utilizing the pen register, the authorities then confirmed that someone at the jail—possibly appellant—was telephoning the Lodge repeatedly. *See* Majority Opinion, 865 S.W.2d, at 947, fn. 2. Armed with that and other information, the authorities obtained a court order for a wiretap on the Lodge telephone. The wiretap subsequently intercepted several incriminating conversations between appellant and others involved in drug trafficking.

Appellant later filed a pretrial motion, which was denied after an evidentiary hearing, arguing that the installation of the pen register without probable cause was an unreasonable search under Article I, § 9, of the Texas Constitution, and urging suppression of all "poisoned fruit" of the pen register, including the incriminating wiretapped conversations. In other words, appellant's complaint was that the State (1) had unlawfully learned that someone at the county jail was telephoning the Lodge and (2) then had exploited that tainted information to obtain a wiretap, which had resulted in incriminating evidence against appellant. Significantly, appellant failed to present any argument or evidence in the trial court with respect to any reasonable expectation of privacy he might have had in the telephone numbers he dialed on the jail telephone.

Article I, § 9, guarantees that the people of this state "shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches." In *Green v. State*, 566 S.W.2d 578, 582 (Tex.Crim.App. 1978), we recognized that "[t]he basic purpose of ... Article 1, Section 9 is to safeguard the privacy of individuals from arbitrary invasions by governmental intrusions." We also recognized that the threshold question with respect to the existence of a constitutionally cognizable "search" is "whether the defendant had a reasonable expectation of privacy [in the thing searched]." *Id.*, at 583.

Given our analysis in *Green*, I have no quarrel with the majority's conclusion that, generally, a defendant has a reasonable ex-

able expectation of privacy in the numbers he dialed on the *jail telephone.*

3. The court of appeals decided, by answering in the negative, the concrete question of whether the State's use of a pen register *in this case* constituted a "search" within the meaning of the Texas Constitution. We granted review of *that* decision. See Tex.R.App.Proc. 200(a). Instead of reviewing *that* decision, however, the majority addresses a different, abstract question, to wit: whether the State's use of a pen register *may* constitute a search *sometimes*, regardless of whether it actually did *in this case.* The majority attempts to defend this anomalous outcome by explaining that it is only addressing the "broad" holding of the court of appeals and that it would be "somewhat ironic ... to dispose of this cause now on the narrower question" *actually presented by the concrete facts.* See Majority Opinion, 865 S.W.2d, at 953–54, fn. 9–10. Without question, the majority's holding is essentially an advisory one, one that is not presented by the court of appeals' decision or the facts of this case. The majority has lost sight of our constitutional obligation to decide the controversy before us *based on the facts of that controversy,* not based upon some hypothetical set of facts that are *not* before us. The majority has apparently decided that it wants to answer an interesting constitutional question while it has the chance, regardless of whether that question is truly presented.

pectation of privacy under Article I, § 9, if (1) he manifests an actual, subjective expectation of privacy (2) that society is willing to accept as objectively reasonable. *See Chapa v. State*, 729 S.W.2d 723, 727 (Tex.Crim.App. 1987). Nor do I quarrel with the majority's conclusion that, in this case, "the appropriate inquiry [with respect to the reasonableness of appellant's expectation of privacy] is whether appellant expected that the numbers he dialed on the [jail] telephone would be free from governmental intrusion, and, if so, [whether] this expectation [is] one that society is prepared to recognize as [objectively] reasonable." Majority Opinion, 865 S.W.2d, at 948–49. However, in my view, the defendant must bear the burden of proving that he had a reasonable expectation of privacy and thus that a "search" within the meaning of the constitution even took place. *Accord, Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Hershenow*, 680 F.2d 847, 855 (CA1 1982); *United States v. Bellina*, 665 F.2d 1335, 1340 (CA4 1981); *Hightower v. State*, 672 P.2d 671, 675 (Okla.Crim.App. 1983); *State v. Rewolinski*, 159 Wis.2d 1, 464 N.W.2d 401, 405–406 (1990). In this case, appellant has failed to prove that he had a reasonable expectation of privacy in the telephone numbers he dialed on the jail telephone.

Appellant offered no argument or evidence in the trial court with respect to any actual, subjective expectation of privacy he might have had. Indeed, the only evidence before the trial court relevant to a subjective expectation of privacy on appellant's part showed that he gave the Lodge's telephone number to two of his fellow jail inmates—people he could not reasonably trust to keep the number secret—and had them telephone the Lodge for him. Clearly, that which a person knowingly reveals to strangers, even in his own home or office, is not subject to the protection of Article I, § 9. *Green v. State*, 566 S.W.2d, at 582.

Appellant has also failed to show that society would accept such an expectation of privacy as being objectively reasonable, and I

believe it is fairly obvious that society would not. In *Hudson v. Palmer*, 468 U.S. 517, 529, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984), the United States Supreme Court addressed the question of whether a prison inmate has an objectively reasonable expectation of privacy in his prison cell. After holding that society was not willing to accept such a privacy expectation as objectively reasonable, the Court explained:

> The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.
>
> Prisons, by definition, are places of involuntary confinement.... During 1981 and the first half of 1982, there were over 120 prisoners murdered by fellow inmates in state and federal prisons. A number of prison personnel were murdered by prisoners during this period....
>
> Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize....
>
> The administration of a prison, we have said, is at best an extraordinarily difficult undertaking. But it would be literally impossible to accomplish the prison objectives identified above if inmates retained a right of privacy in their cells....
>
> Determining whether an expectation of privacy is "legitimate" or "reasonable" necessarily entails a balancing of interests. The two interests here are the interest of

society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. We strike the balance in favor of institutional security, which we have noted is central to all other corrections goals. A right of privacy ... is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

*Hudson v. Palmer*, 468 U.S., at 526–528, 104 S.Ct. at 3199–3201 (citations and some punctuation omitted). The reasoning of *Hudson v. Palmer* is equally applicable to pretrial jail detainees such as appellant. As the Court explained in *Bell v. Wolfish*, 441 U.S. 520, 546, n. 28, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979), "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates."

Accepting the reasoning of *Hudson v. Palmer* and *Bell v. Wolfish*, at least four courts have already held that jail inmates have no objectively reasonable expectation of privacy in calls to non-attorneys on institutional telephones. *See United States v. Amen*, 831 F.2d 373 (CA2 1987); *United States v. Clark*, 651 F.Supp. 76 (M.D.Pa. 1986); *United States v. Vasta*, 649 F.Supp. 974 (S.D.N.Y.1986); *State v. Fox*, 493 N.W.2d 829 (Iowa 1992). I have found no cases holding to the contrary.

In sum, appellant has not demonstrated that he ever had an actual, *subjective* expectation of privacy in the numbers he dialed on the Lubbock County Jail telephone. And in any case, given the need for institutional security, society is not willing to recognize such an expectation as *objectively* reasonable. Thus, I agree with the court of appeals' ultimate conclusion that the trial court did not err in denying appellant's motion to suppress. I would affirm the judgment of the court of appeals, and I dissent to the majority's failure to do so.

McCORMICK, P.J., joins.